**DIVISION OF FAMILY SERVICES,**
Petitioner,

v.

**S.P., Respondent**

**File No. 14–11–4TK**
**Petition No. 14–32534**

Family Court of Delaware,
**IN AND FOR KENT COUNTY.**

Submitted: April 7, 2015
Decided: June 3, 2015

---

Tetra Shockley, Esquire, attorney for the Division of Family Services.

Tabatha Castro, Esquire, Wilmington, attorney for Respondent, S.P.

Nicholas, W.

This is the Court's decision regarding a Petition for Termination and Transfer of Parental Rights filed by the Division of Family Services ("DFS"), a division of the Department of Services for Children, Youth and Their Families ("Department"). The Respondent is S.P., the adoptive father of A.P. ("the Child").

## BACKGROUND

In March, 2014, S.P. was arrested for systematically sexually abusing the Child and for recording and distributing images of the abuse. The Department, through the DFS, filed for and received temporary emergency custody of the Child at that time. In September, 2014, S.P. pleaded guilty to one count of first-degree rape of a child under the age of twelve, one count of sexual exploitation of a child, and two counts of dealing in child pornography. He was sentenced to a total of seventy years in prison, and he is currently incarcerated.

In 2012, the Department had supported S.P.'s adoption of the Child. The Child was eight years old, and he had serious health issues including cerebral palsy and gastrointestinal problems. Based on the information presented by the Department at that time, another judge of this Court approved the adoption. As it happened, the information supplied by the Department was incomplete because it failed to include prior allegations of abuse against S.P.

Prior to seeking to become an adoptive parent, S.P. had been investigated by the Department for two separate allegations of abuse. S.P.'s stepsister alleged that S.P. had sexually molested her. Both S.P. and the stepsister were minors. The Department and law enforcement authorities investigated and interviewed the stepsister. The investigation elicited further disclosures from the step-sister that an adult uncle had allegedly abused her, too. After the stepsister made those disclosures, the focus of the investigation shifted to the uncle. The record indicates that the uncle was arrested, but it is unclear how his case was resolved. In any event, once the focus shifted to the uncle, investigation into S.P. ceased, and the Department closed that case without any finding against S.P. The other earlier investigation into S.P. involved allegations that S.P. had abused his three-year-old cousin. Those allegations were also sexual in nature, specifically that S.P. had fondled or otherwise touched the boy's buttocks. Again, for unknown reasons, the Department closed that case without further investigation and without any determination against S.P. For reasons explained below, the Department did not disclose these prior allegations of abuse to the Court during the adoption proceedings.[1]

During much of the instant proceedings, it was unclear to this Court whether S.P. attempted to hide the prior abuse allegations during the adoption proceedings. The allegations were not addressed in the

---

1. According to a DFS supervisor who testified as part of these proceedings, the DFS worker assigned to review S.P.'s adoption application might not have even investigated any unsubstantiated reports of abuse because such investigation was not required under the procedures in place at the time.

adoption records, the adoption home study or any other filings submitted by S.P. or the Department. This Court was left to speculate whether S.P. was asked about the abuse and thereafter, omitted the information or provided false information, or whether S.P. ·was never asked. In the case of the former, the initial adoption could be seen as the product of a fraud upon the Court and potentially, voided or vacated.[2] Voiding the adoption would have spared the Child the delay of lengthy termination proceedings and consistent with the prevailing statutory purpose, given the Child a quicker permanency decision.[3] At a minimum, the circumstances under which S.P. became the Child's legal father were germane to whether termination of S.P.'s rights was in the Child's best interests. Ultimately, it became clear that S.P. was not questioned about the prior abuse by either the Department or the private agency that conducted the adoption home study. The allegations were also absent from the records submitted to the judge who reviewed the adoption petition. Because much of the information on this point was provided during the Court's discussion of the case with counsel in chambers, the Court held a hearing to memorialize the information in the Court's record.

On April 7, 2015, the Court held the final hearing on the petition to terminate S.P.'s parental rights. Though S.P. had initially opposed any termination of his parental rights, he eventually consented at the April 7 hearing. The Court also heard testimony from a Department witness regarding whether termination was in the

Child's best interests. Thereafter, the Court reserved decision.

### *DISCUSSION*

The unfortunate circumstances of this case require the Court to address both the failings in the original adoption procedures and also the instant petition to terminate S.P.'s parental rights.

### A. The Department Failed to Disclose Mandatory Information About S.P. During the Adoption Proceedings.

■ This case has arisen largely as a result of the Department's mistaken attempt to limit, through administrative regulation, the information that the Department reviews and discloses to the Family Court regarding reports of abuse filed against prospective adoptive parents. Under § 309(d)(3) of Title 31, the Department must provide information regarding whether the prospective parents are "named to the Central Register as the perpetrator of *a report* of child abuse" (emphasis added). At the time § 309(d)(3) was enacted, the "Central Register" was a record of *all* reports of suspected child abuse received by the Department. Though § 309(d) has not been amended, the Department has since reinterpreted § 309(d)(3) to require only disclosure of reports that the Department determines to be *substantiated.* Substantiation refers to a finding by the Department that a preponderance of the evidence establishes that the alleged abuse occurred.[4] For the reasons explained herein, this interpretation is error because § 309(d)(3) requires the Department to inform the Court of all

---

2. *See H.M.A. v. C.A.H.W.,* No. 95–05–03–A, 2013 WL 1748618, at *2 (Del. Fam. Ct. Mar. 28, 2013) (collecting cases).

3. *See* DEL. CODE ANN. tit. 13, § 1115 (Termination and adoption proceedings are "designed to achieve without undue delay the paramount objective of the best interest of the

child, and all questions of interpretation shall be. resolved with that objective in mind."). Unless otherwise indicated, all citations are to the current Delaware Code.

4. DEL. CODE ANN. tit. 16, § 902(22).

reports of abuse, regardless of whether the Department classifies those reports as substantiated. As a result of its errant interpretation of § 309(d)(3), the Department failed to provide the Court with information regarding allegations against S.P. during the Court's prior adoption proceedings.

### 1. Statutory Structure and History of § 309

In 1990, the General Assembly enacted § 309(d) to ensure that prospective adoptive parents provide "fingerprints and other necessary information" so that the Department (or an adoption agency) can obtain the parents' criminal and child abuse history.[5] Using the fingerprints and information, the Department is required to obtain (1) the individual's entire Delaware criminal history,[6] (2) the individual's entire federal criminal history,[7] and (3) a certification from the Department "as to whether the individual is named to the Central Register as the perpetrator of a report of child abuse."[8] The Department must then use "case-by-case judgment" to "assess the information and make a determination" as to whether the individual is suitable to become an adoptive or foster parent.[9] Once the Department makes its determination, the Department must forward its conclusion, and its investigative results, to the Family Court as part of the adoption proceedings.[10] The Court then uses this information in determining whether to approve the adoption.[11] Thus, the ultimate determination of the suitability of the prospective adoptive parent rests with the Court, not the Department.

At the time § 309(d)(3) was enacted, "Central Register" referred to "a statewide central registry of *all reports* [of child abuse] *made in the state*" (emphasis added) as described at § 905(c) of Title 16.[12] This central registry was established

---

5. Del. Code Ann. tit. 31, § 309(d).

6. *Id.* § 309(d)(1).

7. *Id.* § 309(d)(2).

8. *Id.* § 309(d)(3).

9. *Id.* § 309(f).

10. *Id.* § 309(c), (g) (emphasis added). *See* Del. Code Ann. tit. 13, § 912(b)(2), (4), (7); Del. Code Ann. tit. 29, §§ 9003, 9006(1). Because § 309 is aimed primarily at the regulation of professional child care personnel, such as teachers, daycare staff, and healthcare workers, the section frequently refers to "employment" and "employer." However, "child care personnel" is defined to include "applicants wishing to become adoptive or foster parents." *See* Del. Code Ann. tit. 31, § 309(c). (Both professional child care workers and foster and adoptive parents are within the Department's general regulatory authority, *see generally*, Del. Code Ann. tit. 29, § 9003, and administratively, that authority administered by the DFS. *Id.* § 9006(1)). In context, the term employment refers to the endeavor to which the individual has applied. Though odd at first blush, this meaning is confirmed in Title 13, which requires the Department to provide the Court with a report containing, *inter alia*, "information regarding the adoptive parent or parents ...", "[i]nformation regarding the suitability of the [adoptive] placement" and "[a] recommendation [regarding the suitability of the placement]." Del. Code Ann. tit. 13, § 912(b)(2), (4), (7).

11. *See* Del. Code Ann. tit. 13, § 915(a).

12. The use of the term "Central Register" in § 309(d)(3) was anachronistic since the General Assembly had already changed the term in Title 16 from "central register" to "central registry" in 1976. *See* Del. Code Ann. tit. 16, § 905(c) (1975 & supp. 1976). The capitalization of the term is stylistic, apparently done by the Code Revisors. *Compare* 67 Del. Laws, ch. 409, § 1 (1990) *with* Del. Code Ann. tit. 31, § 309(d)(3). *See* Del. Code Ann. tit. 1, § 211 (The Code Revisors may make limited stylistic or organizational changes but those changes do not "alter the sense, meaning or effect of any act of the General Assembly[.]").

in 1974 when the General Assembly amended Title 16 to create Delaware's first mandatory reporting requirements for suspected cases of child abuse.[13] Under that scheme, the Department was required to maintain a county-by-county registry of serious cases of reported abuse, and statewide, the Department was required to maintain a "central registry" of all reports of abuse made to the Department.[14] Not surprisingly, the contemporaneous definition of "central registry" in Title 16 aligned with the description of "Central Register" used in § 309(d)(3).

Since its enactment, § 309(d) has not been amended or otherwise altered.[15] Section 309(d)'s language has not changed, and thus, neither has the section's meaning. Despite this pedigree, the Department has used its Title 31 regulatory authority to attempt to limit impermissibly the scope of the Department's duties under § 309(d)(3).

## 2. The Department's Flawed Regulatory Interpretation of § 309

Presumably in mistaken reliance on subsequent amendments to Title 16, the Department has promulgated a regulation that reinterprets § 309(d)(3) in a manner that conflicts with § 309(d)(3)'s plain language. The regulation addresses the Department's implementation of § 309(d)(3)'s requirement to investigate whether a prospective adoptive parent is "perpetrator of a report of child abuse." The regulation states, in pertinent part, that the Depart-

ment investigator must conduct "a review of the Child Protection Registry to determine if the child care person is named as a perpetrator in a *substantiated* report of child abuse or neglect."[16] By inserting the word "substantiated" into the regulation, the Department has effectively determined that it need only research and disclose certain reports of child abuse (as opposed to all reports of child abuse) involving a prospective adoptive parent. Thus, the regulation impermissibly attempts to limit § 309(d)'s command for full review and disclosure.

In contrast to § 309(d)'s consistency, Title 16's procedures concerning the reporting and investigating of child abuse have continuously evolved. In 2002, the term "central registry" was removed from the definitional section and replaced by the term "Child Protection Registry."[17] The adoption of the flawed regulation coincides with this statutory change.[18] The Child Protection Registry is the list of individuals for whom the Department has substantiated claims of abuse. Though removed from the definitional section, "central registry" remains listed as a synonym for the Child Protection Registry in other sections.[19] Thus, while Title 16 previously utilized the term "central registry" in reference to all reports of abuse, the title now utilizes the term in reference only to substantiated reports of abuse. Title 16 currently uses the term "internal information system" to refer to the full list of all

---

13. *See* DEL. CODE 1953. tit. 16, § 1001 *et seq.* (1954 & supp. 1974).

14. DEL. CODE ANN. tit. 16, § 905(b), (c) (1975 & supp. 1976).

15. To the contrary, the General Assembly has even utilized the language from § 309(d) to describe this Court's powers to order background checks in child custody cases. *See* DEL. CODE ANN. tit. 10, § 925(20)(a).

16. DEL ADMIN. CODE, tit. 9, § 301–5.4 (2002 & supp. 2013) (emphasis added).

17. 73 Del. Laws, ch. 412, § 2 (2002).

18. *See* 5 Del Reg. 1828 (Mar. 2002).

19. *See* DEL. CODE ANN. tit. 16, § 928(a). *See also,* 73 Del. Laws, ch. 412, § 7 (2002).

reports.[20]

■ Though promulgated explicitly under its Title 31 authority,[21] the Department's regulation appears to reinterpret § 309(d) in light of the Title 16 changes. This reinterpretation conflicts with the language and purpose of § 309(d). It also conflicts with established principles of statutory construction. When a specific part of a statutory scheme is adopted by reference, it is "incorporated as of the time of reference and subsequent amendments to it will have no effect upon the adopting statute." [22] In the absence of express legislative intent to incorporate subsequent amendments, the "subsequent amendment of the referred statute has no effect on the reference statute." [23] Thus, the changes to Title 16 do not alter the meaning of § 309(d)(3).

More importantly, the Department's regulatory interpretation runs counter to the General Assembly's intent. "The guiding principle when construing any statute is the search for legislative intent ... '[W]here the intent of the legislature is clearly reflected by unambiguous language in the statute, the language itself controls.' " [24] "A reviewing court may accord due weight, but not defer, to an agency interpretation of a statute administered by it." [25] The regulation runs counter to the General Assembly's intent in several ways. For one, the General Assembly could not have intended § 309(d) to have been limited to substantiated reports since the substantiation process was not even introduced until seven years after § 309(d)'s enactment.[26] For another, the Department's atextual imposition of a substantiated/unsubstantiated dichotomy violates § 309(f)'s command for case-by-case analysis.[27] In some cases, a recent unsubstantiated report of severe abuse might hold more weight than a prior substantiation for a relatively minor incident. Similarly, the Court can always disregard unsubstantiated reports where the underlying allegations were unfounded.

Finally, the Department's interpretation conflicts with our General Assembly's consistent approach to full disclosure when it comes to protecting children. Section 309(d)'s overall structure reflects a clear preference for full disclosure. The section requires disclosure and consideration of full federal and state criminal histories, not merely convictions. Nothing in the statutory scheme suggests that alleged abusers should be given a pass for purposes of adoption. Section 309(d)'s approach to full disclosure dovetails with the Court's powers under Titles 10 [28] and 13 [29] and with the Court's duty to consider "all relevant factors" when determining a child's "best

20. DEL. CODE ANN. tit. 16, § 902(10).

21. See DEL. ADMIN. CODE, tit. 9, § 301–1.0. See also, DEL. CODE ANN. tit. 31, § 309(h).

22. Powell v. Levy Court of Kent Cty., 236 A.2d 374, 376 (Del. 1967) (citing 2 SUTHERLAND STATUTORY CONSTRUCTION § 5208 (3rd ed.)).

23. 2B SUTHERLAND STATUTORY CONSTRUCTION § 51:8 (7th ed.) (West 2014).

24. Cede & Co. v. Technicolor, Inc, 758 A.2d 485, 494 (Del. 2000) (quoting Spielberg v. State, 558 A.2d 291, 293 (Del. 1989)).

25. Pub. Water Supply Co. v. DiPasquale, 735 A.2d 378, 382 (Del. 1999) (internal citations omitted).

26. See 71 Del. Laws ch. 199, § 2 (1997).

27. This is not the first time the Department has attempted to use regulations to avoid a legislative command to conduct individualized determinations. See Div. of Family Servs. v. R.R., No. CK10–01009, 2011 WL 5346106 (Del. Fam. Ct. Aug. 31, 2011).

28. See DEL. CODE ANN. tit. 10, § 925(20)(a).

29. See DEL. CODE ANN. tit. 13, § 915.

interests."[30] At § 309(d)(3)'s enactment, the section required full disclosure of all reports of abuse, not just substantiated reports.

On some level, it is easy to understand how the Department's mistaken interpretation occurred. A regulatory drafter unaware of the evolutionary history of Title 16, and the contrasted constancy of § 309(d), might easily make this mistake. Likewise, § 309(d)'s idiosyncratic structure, in which it equivocates prospective adoptive parents with prospective child care workers, might have influenced the errant interpretation.[31] Nevertheless, the gaps between the Department's interpretation and the statute's requirements are apparent upon any close inspection. Tellingly, the Department exposes these gaps through its approach to other types of litigation. In this Court's experience, the Department routinely discloses unsubstantiated reports of abuse in cases where the Department is adverse to the alleged abuser, for instance when the Department seeks termination of a parent's rights or when the Department opposes a prospective guardian. At base, though, the Department's inconsistent approach to the release of unsubstantiated reports of abuse highlights the limits and flaws of their interpretive regulation.

Other parts of the Department's own regulatory scheme recognize that substantiation alone does not tell the full story. For cases that are unsubstantiated, the Department has two classifications: "Unsubstantiated—No Evidence" and "Unsubstantiated with Concern."[32] Under the

Department's regulatory interpretation of § 309(d)(3), however, even unsubstantiated reports of abuse where the Department has remaining concerns do not necessarily reach the reviewing judge. It is also important to note that viewing the older term "Central Register" as a synonym for the newer term "Child Protection Registry" has another distinct flaw. Namely, an individual's placement on the Child Protection Registry is often for a fixed term. Depending on the nature and severity of the underlying abuse, individuals who are substantiated may be placed on the registry for as little as a year or even, not at all.[33] Given the phrasing of the regulation, it is unclear whether the Department reviews and discloses substantiated reports of abuse if the abuser has since been removed from the Child Protection Registry. As these practical concerns make clear, looking only to the Child Protection Registry or to the substantiated cases does not fully protect children or comply with § 309(d)(3)'s requirements.

For these reasons, the Court concludes that the Department's regulatory reinterpretation, and limitation, of § 309(d)(3) is in error. By inserting the word "substantiated" into its regulation, the Department has improperly circumvented the General Assembly's intent for full review and disclosure of all reports of abuse against prospective adoptive parents. To the extent that the Department's regulations promulgated under Title 31 purport to require anything less than § 309(d)'s statutory requirement of full disclosure, then those regulations are void, at least as applied to adoptions.[34]

30. *Id.* § 722(a). *See id.* §§ 722A, 726A.

31. *See supra,* note 10.

32. Del. Admin. Code, tit. 9, § 304–11.2, 11.3.

33. *See* Del. Code Ann. tit. 16, § 923 (setting "child protection levels"). For example, bar-

ring further substantiations, individuals substantiated at Level 2 are "automatically removed from the Registry after 3 years." *Id.* § 923(b)(2).

34. *See Del. Dep't of Natural Res. & Envt'l Control v. Sussex Cnty.,* 34 A.3d 1087, 1096 (Del. 2011) (A court must strike administra-

### 3. The Effect of the Department's Flawed Approach

This case exemplifies how the Department's regulatory approach to § 309(d)(3) falls short of the type of review and disclosure that § 309(d) demands. Review and disclosure of only substantiated reports does not provide the necessary protection for the children at issue in the adoption proceedings. As the DFS representative acknowledged, its review committee might have opposed S.P.'s petition had the committee known of the prior reports of abuse against S.P. At a minimum, the committee and the reviewing judge likely would have conducted further inquiry before placing a minor child with special needs in the home of a man who had previously faced allegations of abuse. Instead, following the misguided regulation, no one from the Department even reviewed the prior unsubstantiated reports against S.P. when S.P. filed to adopt the child. Because the Department itself was unaware of the reports, those reports of abuse never reached the Family Court. As a result, in this case, an adoption was granted on incomplete information when that adoption might not have been granted had the Department known or disclosed the full information.

The Department has reported to this Court that, in response to this and other cases, the Department has recently developed procedures to consider unsubstantiated reports of abuse in its review of prospective adoptive parents. The Court need not address whether the Department has the authority to develop internal policies that undermine its published regulations, especially where the policies might match statutory commands more closely than the subverted regulations. Likewise,

the Court cannot speculate about how many adoptions this flawed regulation has affected since its promulgation in 2002. It is enough to say that, in the context of this case, the Department failed to provide mandatory information to the Family Court as a result of the Department's reliance on its faulty interpretation of § 309(d)(3). Because that information about unsubstantiated reports was accessible only by the Department, the judge reviewing the adoption had no way to evaluate the unsubstantiated reports as part of the adoption proceedings.

A review of only substantiated reports may provide sufficient evidence that adoption is not appropriate; at minimum, review of substantiations might illicit further inquiry. But suppose, as in this case, the Department's prior substantiation investigation was closed for reasons unrelated to the validity of the underlying claims of abuse. Or, consider the situation in which an abuser preys upon children who are too young or too disabled to fully communicate the abuse to Department authorities or to law enforcement. In those circumstances, to treat review of substantiations as sufficient—to take them as the full picture of the prospective adoptive parent, as the Department wants—is simply to accept the Department's assertion that a prospective adoptive parent is fit. This guts the judicial review of adoption petitions. The point of judicial review is to examine and evaluate the Department's conclusions, not merely to bless them.[35] The point is to determine that the prospective adoptive parent is fit and that the legal requirements for adoption have been followed actually, not just purportedly or perfunctorily. Again, the Court holds the ultimate authority for granting adoptions,

tive regulations that exceed the agency's statutory grant of authority since such regulations are void.).

35. See DEL. CODE ANN. tit. 13, § 915.

and the Court cannot perform this function without access to complete information and to the Department's individualized assessment of that information. Consequently, the Court requires, and the statutory scheme demands, full disclosure of all reports of abuse. That failed to happen in S.P.'s case.

### 4. Conclusion

In sum, the Department has an obligation under § 309(d)(3) to consider information regarding all reports of suspected child abuse and also to disclose that information to Family Court as part of all adoption proceedings. In this case, the Department should have, but did not, comply with its duty of full review and disclosure. As a result, information that might have led the Court to deny, or at least more closely examine, S.P.'s petition for adoption was never presented to the judge who oversaw the adoption proceedings.

### B. Termination of S.P.'s Parental Rights Is Warranted.

 The Court now turns to the question of whether S.P.'s parental rights in the Child should be terminated. When Family Court reviews a petition for termination of parental rights, the Court undertakes a two-part analysis.[36] First, the Court determines whether a statutory ground for termination exists. Second, if the Court finds a statutory ground for termination, the Court determines whether termination is in the child's best interests. Both steps in the analysis must be established by clear and convincing evidence.[37]

Here, the evidence establishes that termination of parental rights is appropriate. Voluntary consent of the parent is a statutory ground for termination.[38] Since S.P. voluntarily consented to termination of his rights, the Court finds that a statutory ground is established.[39] Additionally, the evidence establishes that termination is in the Child's best interests.[40] The Court has considered the circumstances surrounding the Child's adoption and the abuse the Child suffered at S.P.'s hands. The Court has also considered the Child's medical and emotional needs and his current circumstances. This is the rare case in which all applicable best interest factors weigh in favor of termination. Consequently, the Court concludes that there is clear and convincing evidence that there are grounds to terminate S.P. rights and that termination is in the Child's best interests.

### CONCLUSION

IT IS HEREBY ORDERED THAT the parental rights of S.P. are TERMINATED with regard to the minor child A.P., born March 6, 2004. Custody of the minor

---

36. *Id.* § 1103(a).

37. *Powell v. Dept. of Servs. for Children, Youth & their Families*, 963 A.2d 724, 731 (Del. 2008).

38. DEL. CODE ANN. tit. 13, § 1103(a)(1).

39. Because only one ground is necessary, the Court need not consider whether other grounds apply. *See, e.g.,* DEL. CODE ANN. tit. 13, § 1103(a)(4)(a) (Commission of a felony rape in which the victim was a child is a statutory ground for termination.).

40. *See* DEL. CODE ANN. tit. 13, § 722(a). In determining the best interests of the child, the Court shall consider all relevant factors including, to the extent applicable (1) the wishes of the parents; (2) the wishes of the child; (3) the interaction between the child and his parents or any persons who might affect his best interests; (4) the child's adjustment to home, school, and community; (5) the health of all individuals involved; (6) the parents' compliance with their legal duties to the child; (7) evidence of domestic violence; and (8) the criminal history of all individuals involved. *Id.*

child is hereby transferred to the Division of Family Services.

**IT IS SO ORDERED**

