NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 3

No. 2016-257

In re P.K., Juvenile

Supreme Court

On Appeal from
Superior Court, Caledonia Unit,
Family Division

December Term, 2016

Robert R. Bent, J.

Michael Rose, St. Albans, for Appellant Mother.

William H. Sorrell, Attorney General, Montpelier, and Jared C. Bianchi, Assistant Attorney
  General, Waterbury, for Appellee.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1.   **REIBER, C.J.**   Mother appeals the superior court's decision denying her motion to set aside a previous order terminating her parental rights to her daughter, P.K. Mother voluntarily relinquished her parental rights in the same proceeding in which she entered into a postadoption-contact agreement with P.K.'s paternal grandmother, with whom the child had been placed by the Department for Children and Families (DCF). After DCF removed P.K. from the paternal grandmother's home and placed her with another pre-adoptive foster family, mother moved to set aside the termination order. We affirm the superior court's denial of mother's motion.

¶ 2.    P.K was born in April 2012 and adjudicated a child in need of care or supervision (CHINS) in November 2013. In January 2015, DCF filed petitions to terminate both father's and mother's parental rights. Father voluntarily relinquished his parental rights in July 2015.

¶ 3.    At a hearing on October 9, 2015, mother voluntarily relinquished her parental rights after entering into a postadoption-contact agreement pursuant to 33 V.S.A. § 5124. At the outset of the hearing, the termination agreement, the accompanying affidavit in support of the agreement, a waiver of notices, and the postadoption-contact agreement were introduced and admitted as exhibits. Mother acknowledged that she was knowingly and voluntarily relinquishing her parental rights and that there was "no going back." Mother's attorney explained that mother was agreeing to relinquish her parental rights in part because of the postadoption-contact agreement and in part because a contested termination hearing might have resulted in findings that could have prejudiced her with respect to the child she was expecting.

¶ 4.    The postadoption-contact agreement was signed by mother, the paternal grandmother, who was the intended adoptive parent, the DCF caseworker, P.K.'s guardian ad litem (GAL), and P.K.'s attorney. It provided that mother and P.K. would have supervised seven-hour visits once a month, as well as visits on Thanksgiving, Christmas, and P.K.'s birthday, as long as mother did not appear for the visits under the influence. Among other things, the agreement stated, in compliance with § 5124, that: (1) it would become enforceable only after mother voluntarily relinquished her parental rights, the court approved the agreement upon finding that it was in the child's best interests, and the child was legally adopted in Vermont by the adoptive parent who had signed the agreement; and (2) "the termination of parental rights cannot be undone and remains permanent, even if the intended adoption does not happen, the adoptive parent(s) do not follow the terms of the agreement, or the adoption is later dissolved."

¶ 5.    Following the hearing, the superior court issued a final order terminating mother's parental rights. The order stated that: (1) mother had given considerable thought to her decision

2

to voluntarily relinquish her parental rights to P.K. and had done so because she believed it was in P.K.'s best interest to do so; (2) she understood that, pursuant to her agreement to relinquish her parental rights and the court's order to that effect, she would "have no further legal right to visitation and contact with [P.K.]"; (3) she further understood that the court's order "terminates all her rights of any kind to [P.K.]"; (4) she indicated that she had consulted with her attorney and was satisfied with his legal representation and advice; (5) the termination documents she submitted to the court were executed "without duress or coercion, and while [she was] competent and not under the influence of any judgment affecting substances"; (6) all parties, including P.K.'s GAL, agreed that it was in P.K.'s best interest that she be freed for adoption and that mother's residual parental rights be terminated; and (7) all parties agreed that it was in P.K.'s best interest that custody be transferred to DCF, without limitation as to adoption.

¶ 6.    On December 17, 2015, P.K. was removed from her paternal grandmother's residence on an emergency basis after a neighbor reported that the then three-year-old child had been locked outside the grandmother's residence, without being appropriately dressed for the weather. The neighbor reported that the child had been told by her parents, who were "taking their medicine," to remain outside until she was called back in on the cell phone they had given her. Based on a follow-up investigation, DCF removed P.K. from the grandmother's home and discontinued the grandmother as an adoption candidate.

¶ 7.    On January 22, 2016, mother filed a motion, pursuant to Vermont Rule of Civil Procedure 60(b), to set aside the October 9, 2015 termination order in the best interest of P.K. See 33 V.S.A. § 5113(a) ("An order of the Court may be set aside in accordance with Rule 60 of the Vermont Rules of Civil Procedure."). She initially argued that the termination order had been based on the parties' mistaken belief that the paternal grandmother would be the adoptive parent and would allow visitation with mother. She later supplemented that argument by asserting that

3

the termination order must be set aside in the interests of justice and to allow for a new postadoption-contact agreement to become effective.

¶ 8. At an April 28, 2016 hearing on the motion, mother's attorney asked the superior court to look beyond the four corners of the agreements that mother had entered into and exercise its equitable powers to correct an injustice. DCF's attorney stated that it was "the Department's position that P.K. should continue to have a relationship with her mother and her grandmother," but that mother's visits with P.K. while the child was living with her new pre-adoptive family had been "more detrimental to P.K. than helpful." P.K.'s GAL and attorney agreed with DCF's attorney that it would not be in P.K.'s best interest for DCF to move P.K. and tell her that she would never see her mother and grandmother again. Mother's attorney argued that the court had continuing and equitable jurisdiction to do what was necessary to assure that P.K. continued to have a relationship with her mother, which everyone agreed was in her best interest. Mother's attorney stated that "the preference would be for the Court to analyze the motion on 60(b)(1) and 60(b)(6)."

¶ 9. On June 9, 2016, the superior court denied the motion, ruling that no mistake existed to permit relief under Rule 60(b)(1) and that the relief mother sought could not be justified under Rule 60(b)(6), the catchall provision. The court acknowledged that a new postadoption-contact agreement in this case appeared to be foreclosed by the statutory requirement that such agreements precede a termination order. See 33 V.S.A. § 5124(a)(2). Nevertheless, the court concluded that the remedy mother sought was precluded by the unequivocal language set forth in § 5124(b)(2)(B), which provides that, in approving a postadoption-contact agreement, the court must determine that each parent has acknowledged "that the termination of parental rights is irrevocable, even if the intended adoption is not finalized, the adoptive parents do not abide by the postadoption contact agreement, or the adoption is later dissolved." The court further concluded that, given this statutory language, the Legislature's concern with finality, and the length of time

4

reopening this case would entail, relief under Rule 60(b)(6) was not available. While suggesting that there could be cases in which DCF's post-termination actions implicated the implied covenant of good faith and fair dealing, which might call for court action, the court found no such circumstances here.

¶ 10. On appeal, mother argues that the superior court erred by not employing available legal remedies to safeguard her ongoing relationship with P.K., which the court necessarily found to be in P.K.'s best interest in approving the postadoption-contact agreement. Mother acknowledges that relief under Rule 60(b) is unavailable because the focus of such a motion is on her rather than the best interests of the child, which is the focus of CHINS proceedings. She also acknowledges that the parties focused almost exclusively on Rule 60(b) at the hearing on her motion to vacate the termination order, but she asserts that the superior court had an independent duty to consider the child's best interests.

¶ 11. Mother contends that relief is available under 33 V.S.A. § 5113(b), which generally permits orders to be modified based on changed circumstances, due to the changed circumstances resulting from the paternal grandmother's removal as a preadoptive parent. She seeks to distinguish the facts of this case from those in In re A.W. & J.W., where we held "that § 5113(b) does not apply to an order terminating parental rights." 2013 VT 107, ¶ 12, 195 Vt. 226, 87 A.3d 508. She further contends that a protective order to safeguard her relationship with P.K. could be issued pursuant to 33 V.S.A. § 5115. DCF responds that the superior court acted well within its wide discretion in denying relief under Rule 60(b), that mother waived any argument under § 5113(b), and that, in any event, this Court's decision in In re A.W. precludes relief under that provision.

¶ 12. Even though mother has taken a different tack on appeal, we first consider her argument for relief under Rule 60(b), which was the basis for her motion in the superior court. Mother sought relief under Rule 60(b)(1), which allows for relief due to "mistake, inadvertence,

5

surprise, or excusable neglect," or, alternatively, under Rule 60(b)(6), the general catchall provision aimed at preventing hardship or injustice. A motion for relief from judgment pursuant to Rule 60(b) "is addressed to the discretion of the trial court and is not subject to appellate review unless it clearly and affirmatively appears from the record that such discretion was withheld or otherwise abused." Richwagen v. Richwagen, 153 Vt. 1, 3-4, 568 A.2d 419, 420 (1989) (quotation omitted).

¶ 13.    As the superior court found, this is not a situation where mother entered into the postadoption-contact agreement under any mistaken belief. At the time she signed the agreement, the paternal grandmother was the pre-adoptive parent, and mother confirmed her understanding that the termination of her parental rights could not be undone even if the anticipated adoption did not occur. Nor can mother prevail under Rule 60(b)(6). Because of the concern for "certainty and finality of judgments," Rule 60(b)(6) does not provide relief "from tactical decisions which in retrospect may seem ill advised." Richwagen, 153 Vt. at 4, 568 A.2d at 421 (quotation omitted). Here, mother made her choice, among various options she had, to voluntarily relinquish her parental rights and sign the postadoption-contact agreement, being fully aware of the potential consequences of that decision. See id. at 5, 568 A.2d at 421 ("Among the various avenues potentially available to her, she made her choice, and we cannot relieve her of that choice when it does not have the legal effect that she intended." (citation omitted)). The need for finality is particularly great in termination cases. Given the need for finality in such cases and the Legislature's unequivocal statutory intent not to disturb termination decisions even if a postadoption-contact agreement falls through, the trial court acted well within its discretion in denying relief under Rule 60(b)(6).

¶ 14.    On appeal, instead of seeking relief pursuant to Rule 60(b), as she did before the superior court, mother seeks relief under 33 V.S.A. § 5113(b), claiming changed circumstances. The State contends that mother waived this argument by not raising it below. See In re White, 172

6

Vt. 335, 343, 779 A.2d 1264, 1270 (2001) (stating that issues not presented with specificity and clarity to trial court are not preserved for appeal).  In the superior court proceedings, mother cited § 5113(b), noting only that this Court had held that the section did not apply to termination orders, but then focused her argument, both in her motion and at the hearing, exclusively on Rule 60(b). Mother stated near the end of the hearing that her "preference" would be for the superior court to analyze her motion under Rule 60(b).  In its decision, the court noted that mother had not raised any argument under § 5113(b) and that therefore it would not reach the issue.

¶ 15.    While we agree with the State that mother did not pursue an argument grounded in § 5113(b) because of her apparent assumption that that avenue of relief was foreclosed by this Court's decision in A.W., we reaffirm our holding "that § 5113(b) does not apply to an order terminating parental rights."  In re A.W. & J.W., 2013 VT 107, ¶ 12.  Mother seeks to distinguish A.W. on the grounds that the parent in that case asserted changed circumstances based on his improved parenting ability since the termination order had issued, while in this case she asserts changed circumstances based on the best interests of the child.  She points to the acknowledgement by all parties at the time she signed the agreements, as well as the court's finding in approving the postadoption-contact agreement, that her continued contact with P.K. would be in the child's best interests.  She also points to comments at the motion hearing made by DCF's attorney, as well as P.K.'s attorney and GAL, acknowledging the same.

¶ 16.    We find these arguments unavailing.  To be sure, the changed circumstances asserted in this case are different from those asserted in A.W.  But the principal grounds for our holding in A.W. apply to all termination orders.  We relied upon the explicit "legislative purpose to provide timely permanency to children," as well as the uniqueness of termination orders, which are inherently permanent in nature and must be supported by clear and convincing evidence. Id. ¶¶ 10-12; see also 33 V.S.A. § 5101(a)(4) (stating that "safety and timely permanency for children are the paramount concerns in the administration and conduct of proceedings under the

7

juvenile judicial proceedings chapters" (emphasis added)). We reasoned that "[a]llowing motions such as father's would preclude a termination order from ever becoming truly final, thus denying the timely permanency to the child that the Legislature specifically desired." In re A.W. & J.W., 2013 VT 107, ¶ 12 (concluding that allowing parent to seek modification of termination orders based on changed circumstances pursuant to § 5113(b) "would indefinitely expand the termination process and abolish the intended permanency of a termination-of-parental-rights order").

¶ 17. This reasoning is generally applicable to all termination orders, regardless of the basis for the alleged changed circumstances. Indeed, as noted, the Legislature explicitly requires courts, before approving postadoption-contact agreements, to find "that the child's best interests will be served by postadoption communication or contact with either or both parents," 33 V.S.A. § 5124(b)(1)(A); nevertheless, in the same statute, the Legislature also requires courts to obtain "a written acknowledgement by each parent that the termination of parental rights is irrevocable, even if the intended adoption is not finalized, the adoptive parents do not abide by the postadoption contact agreement, or the adoption is later dissolved," id. § 5124(b)(2)(B). In short, our holding in A.W. with respect to § 5113(b) governs the instant case.

¶ 18. Nor is any relief available pursuant to 33 V.S.A. § 5115(a), which generally permits the superior court to issue protective orders upon a showing that "the conduct of a person . . . is or may be detrimental or harmful to a child." Approving a postadoption-contact agreement based, in part, on a finding that the agreement will serve the child's best interests is not the same as finding that the child will be harmed if the agreement is not fulfilled.

¶ 19. Moreover, permitting a protective order in this situation would be directly inconsistent with the Legislature's more specific and recent recognition in § 5124 that, although a postadoption-contact agreement cannot be approved unless it serves the child's best interests, any parent who is a party to such an agreement must acknowledge that the termination of that parent's parental rights is final even if the adoption or expected contact does not occur. See Our Lady of

8

Ephesus House of Prayer, Inc. v. Town of Jamaica, 2005 VT 16, ¶ 16, 178 Vt. 35, 869 Vt. 145 (stating that conflicting statutes covering same subject matter are harmonized by giving effect to more specific and more recent statute). After signing the postadoption-contact agreement, mother voluntarily relinquished her parental rights, acknowledging that doing so was in P.K.'s best interests and meant that she had no further legal right to parent-child contact with P.K. The postadoption-contact agreement was expressly conditioned upon the adoption being completed. Without a completed adoption, the signed agreement conferred no rights. Thus, any rights afforded mother under the agreement would not ripen until completion of the adoption.

¶ 20. The superior court noted that, on the one hand, § 5124 requires parents to acknowledge the finality of termination orders even if a postadoption-contact agreement is not finalized, but on the other hand, provides that agreements may be entered into if a termination order has not yet issued. Compare 33 V.S.A. § 5124(a)(2) with id. § 5124(b)(2)(B). Thus, in situations such as this, where an initial postadoption-contact agreement did not come to fruition, the court suggested that a parent could not enter into a new agreement under § 5124 because a final termination order had been issued. We need not consider this issue, as nothing in the record suggests that the parties have reached a new agreement that they are asking the superior court to approve.

Affirmed.

FOR THE COURT:

_____

Chief Justice

9