VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.      23-AP-061

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

JULY TERM,   2023

In re E.R., Juvenile
(N.R., Father* & J.G., Mother*)

}
}
}
}
}
}

APPEALED FROM:

Superior Court, Bennington Unit,
Family Division
CASE NO. 77-3-18 Bnjv
Trial Judge: Howard A. Kalfus

In the above-entitled cause, the Clerk will enter:

Mother and father appeal from the family division's final order terminating their parental rights as to their son, E.R.  We affirm.

E.R. was born in March 2018.  The day after E.R. was born, the Department for Children and Families (DCF) received a report that parents were unable to care for a newborn because of their developmental disabilities.  DCF investigated and determined that mother was diagnosed with attention deficit hyperactivity disorder and had struggled with short-term memory.  She received no prenatal care for E.R. and was not sure that she was pregnant until going into labor.  Father had a learning disability that impacted his basic reading and mathematical abilities.  Following E.R.'s birth, hospital staff observed that parents had difficulty recognizing E.R.'s needs and required reminders about how to provide basic care such as diaper changing and washing hands before feeding.

DCF sought an emergency-care order, which the family division granted in late March 2018, giving DCF temporary custody.  Shortly thereafter, at the temporary care hearing, the court granted paternal grandparents conditional custody.  Grandparents agreed to care for E.R. and also have parents live with them, with the expectation that parents would be E.R.'s primary caregivers and grandparents would provide monitoring and education about caring for a newborn.  E.R. has remained living with grandparents since then.  However, due to tensions between parents and grandparents, parents moved out in August 2018.

Several months after birth, E.R. began exhibiting symptoms of a serious condition requiring extraordinary ongoing medical attention.  Due to E.R.'s unusual condition, not conclusively diagnosed, his body does not produce enough cortisol to fight illness or injury, and he does not feel pain.  This condition results in frequent and dangerous reductions in his blood-oxygen levels.  He requires nearly constant monitoring and substantial medical attention throughout the day.  It is unknown whether he will ever outgrow this condition.

In July 2018, the court adjudicated E.R. a child in need of care or supervision based on the parties' agreement. In October 2018, the court approved a disposition case plan with a goal of reunification with parents within twelve months. In March 2020, DCF filed a termination-of-parental-rights (TPR) petition based on parents' developmental disabilities and their lack of progress toward being able to care for E.R.

In May 2021, following a contested hearing, the court denied the TPR petition. The court ordered DCF to prepare a new permanency plan to give parents more time to demonstrate that they could parent E.R. and learn how to meet his specialized medical needs. The court also recommended giving each parent their own family time coach and increasing visits with E.R.

DCF filed an amended permanency plan incorporating the court's directives and recommendations, which the court approved in August 2021. The plan had a goal of reunification by May 2022, but the court later approved extending reunification until September 2022. Ultimately, DCF sought to amend the case plan goal to adoption and filed a second TPR petition.

Following a two-day contested TPR hearing in February 2023, the court issued a written decision terminating both parents' parental rights. The court found that parents engaged consistently with DCF and made efforts to follow case plan expectations, including meeting with family time coaches and working with nurses to learn how to attend to E.R.'s medical needs, but parents made little progress toward being able to care for E.R. The court noted several major concerns, including that parents did not follow medical protocols and would often forget protocols soon after learning them; their visits remained supervised because they were consistently distracted by their cell phones and had poor reaction time when E.R. got into a risky situation; and their poor personal hygiene and consistent failure to keep their home in a sanitary condition presented serious risks to E.R.'s health. The court also found that E.R. was thriving in grandparents' home where he had lived all of his life, they were willing to adopt him, and any change in his home or medical team would be detrimental to him. The court concluded that parents' progress had stagnated and that termination was in E.R.'s best interests.

On appeal, father raises two arguments. First, he contends that the court impermissibly based its stagnation conclusion on his lack of opportunity to practice his caregiving skills by actually providing medical care to his son, which was a factor outside of his control. Second, he argues that the court erred in its analysis of whether he could resume parenting within a reasonable period of time because his slow progress was not his fault but rather due to DCF's failure to provide him with adequate reunification services. Mother argues that the court erred in concluding that terminating her parental rights was in E.R.'s best interests because grandparents intended to keep mother involved in E.R.'s life.

When the termination of parental rights is sought after initial disposition, the trial court must conduct a two-step analysis. In re B.W., 162 Vt. 287, 291 (1994). The court must first find that there has been a change in circumstances, and second "that termination of parental rights is in the child's best interests." In re S.W., 2003 VT 90, ¶ 4, 176 Vt. 517 (mem.); see also 33 V.S.A. § 5113(b) (requiring court to find change in circumstances before modifying existing order). A change of circumstances is commonly demonstrated through parental stagnation, which occurs when "the parent has not made the progress expected in the plan of services for the family despite the passage of time." In re D.M., 2004 VT 41, ¶ 5, 176 Vt. 639 (mem.). In assessing the child's best interests, the family division is guided by the statutory criteria. 33

2

V.S.A. § 5114(a). The most important factor is whether the parent can resume parenting duties within a reasonable time. In re J.B., 167 Vt. 637, 639 (1998) (mem.). On appeal, we will uphold the family division's conclusions if supported by the findings and affirm the findings unless clearly erroneous. In re A.F., 160 Vt. 175, 178 (1993).

The record does not support father's assertion that the family division based its stagnation conclusion on factors beyond his control. Although the level of assistance that DCF provides to parents may be relevant to determining whether a parent will be able to resume parenting duties within a reasonable time, the question of whether DCF made reasonable efforts to achieve reunification is separate from whether there has been a change of circumstances or whether termination is in the child's best interests. In re C.P., 2012 VT 100, ¶ 38, 193 Vt. 29. Parents had ample opportunity over the course of several years to demonstrate their ability to retain and apply fundamental parenting skills, and to understand risks to E.R.'s health and respond appropriately during supervised visits.

Father emphasizes the court's statement that it was puzzled as to why parents' supervised visits at grandparents' home were not used as an opportunity for parents to practice preparing E.R.'s medication or attach his pulse oximeter. But the court's decision was not based solely or even primarily on parents' ability to administer medication or apply monitoring devices; rather it was founded on parents' continuing failure to recognize risks and behave in a way that would ensure E.R.'s safety and their inability to consistently retain and apply necessary parenting skills. Father also points to his and mother's testimony wherein they properly recited certain protocols established by E.R.'s medical team. But remembering some protocols at trial does not undermine the court's finding that "Mother and Father appear not to always follow or even remember the established protocol related to [E.R.]'s medical condition." The court noted one example, to which the parties devoted considerable testimony, where during a supervised visit E.R. was drinking out of mother's cold beverage and this caused E.R.'s lips to turn purple with each sip. Although parents admitted that they thought the discoloration could be a sign of a serious medical event, they did not follow the protocol by contacting grandparents immediately, and instead only mentioned it to them several hours later.

The court also found, and father does not contest, that parents' progress with respect to basic parenting skills "was inconsistent. They would demonstrate that they have gained parenting skills and then regress after several weeks, forgetting those skills." Additionally, father does not challenge the court's finding that E.R. is a "fast, energetic toddler who climbs and runs, requiring constant, eyes-on supervision," and that parents had poor reaction time when E.R. would get himself into a dangerous situation because they were consistently distracted by their cell phones during visits. Parents also failed to understand that an unsanitary environment could pose serious health risks for E.R., despite numerous warnings from DCF. The persistent unsanitary condition of their home combined with their lack of personal hygiene demonstrated a lack of awareness of how their behaviors could affect E.R.'s health and safety, given his extraordinary medical needs. Although parents testified that they practice good personal hygiene and keep their apartment clean when necessary, the court apparently did not find this testimony credible, and we will not second-guess its credibility determinations. Mullin v. Phelps, 162 Vt. 250, 261 (1994) (role of Supreme Court in reviewing findings of fact is not to reweigh evidence or make findings of credibility de novo). These concerns were all within parents' control and supported the court's conclusion that parents' progress had stagnated.

3

We are also not persuaded by father's argument that the court's termination conclusion was erroneous because his failure to demonstrate the ability to care for E.R. was not his fault but due to DCF not instituting unsupervised visitation. DCF did not allow unsupervised visits because parents had not shown that they could respond to emerging risks to E.R.'s health in a timely and safe manner. In particular, both parents were repeatedly distracted by their cell phones during visits and thus reacted too slowly to E.R.—an active child who needed constant supervision to avoid risky situations that would trigger his symptoms. Thus, the lack of unsupervised visits was due to parents' behavior, not any error by DCF. DCF was not required to put E.R. in a potentially harmful situation just to allow parents the opportunity to try to independently care for him. See In re C.L., 143 Vt. 554, 558 (1983) (stating that mother's "right to the care, custody, and control of [her] children, although fundamental, is not absolute and may be overcome by the State's interest, under the doctrine of parens patriae, in ensuring the protection and care of its juveniles").

Although the court recognized parents' consistent engagement with parenting courses, Easterseals, and the Visiting Nurses Association over the course of five years, the court found that parents had still not demonstrated the ability to retain and apply basic parenting skills, let alone the specialized skills required to meet E.R.'s dire medical needs. The court determined that it would take "many, many" more months for parents to develop these skills, and that this was inconsistent with E.R.'s need for permanency. The court's findings are well-supported by record evidence, which in turn support its determination that parents would not be able to resume parenting within a reasonable time and its ultimate conclusion that TPR was in E.R.'s best interests.

Finally, mother's contention that the court erred in terminating her parental rights because grandparents intended to facilitate a relationship between E.R. and mother is unavailing. Once a court concludes that TPR is in a child's best interests, it need not consider other permanency options even if some contact with one or both parents would be beneficial for the child. In re G.F., 2007 VT 11, ¶ 20, 181 Vt. 593 (mem.). The likelihood that the parent will be able to resume parenting duties within a reasonable time is the most important of the best-interests factors. In re J.B., 167 Vt. at 639. Moreover, terminating parental rights does not preclude the child's adoptive family from allowing the parent to have contact with the child. See In re P.K., 2017 VT 3, ¶ 13, 204 Vt. 102 (acknowledging validity of postadoption agreement allowing mother to contact child after termination of parental rights). As explained above, the court's TPR conclusion as to both parents is amply supported by its findings and the evidence adduced at trial. The possible existence of some benefit to E.R. from continuing contact with mother does not undermine the court's determination that terminating her parental rights was in E.R.'s best interests.

Affirmed.

BY THE COURT:

_____
Harold E. Eaton, Jr., Associate Justice


_____
Karen R. Carroll, Associate Justice


_____
William D. Cohen, Associate Justice