NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2024 VT 60

No. 24-AP-012

| | |
|---|---|
| In re G.L., Juvenile | Supreme Court |
| | On Appeal from Superior Court, Franklin Unit, Family Division |
| | June Term, 2024 |

Howard E. Van Benthuysen, J. (Ret.)

Matthew Valerio, Defender General, and Kerrie Johnson, Appellate Defender, Montpelier, for Appellant.

Charity R. Clark, Attorney General, Montpelier, and Zachary D. Martin, Assistant Attorney General, Brattleboro, for Appellee Department for Children and Families.

PRESENT: Reiber, C.J., Eaton, Carroll and Waples, JJ.

¶ 1. **WAPLES, J.** Mother moved to set aside a family division order terminating her parental rights in her daughter G.L.[1] She sought relief from the December 2021 judgment on several grounds, including an allegation that the Department for Children and Families (DCF) perpetrated fraud on the court in connection with certain information about G.L.'s long-term, preadoptive foster parents. The trial court denied mother's motion, and, on appeal, she argues that it erred in: (1) excluding evidence she offered in support of alternative arguments for relief;

---

[1] Father's rights in G.L. were terminated in the same order. He did not join mother's motion and is not a party to this appeal. As a result, this decision focuses on the facts relevant to mother.

(2) denying her motion to reopen the evidence; and (3) concluding that DCF did not engage in fraud on the court. We affirm.

¶ 2. The following facts are drawn from the record and the unchallenged findings in the order on appeal. G.L. was born in April 2019. In September of the same year, the State filed a petition seeking a determination that she was a child in need of care or supervision (CHINS). The supporting affidavit alleged that G.L.'s older half-brother arrived at school with a significant facial injury and reported that mother struck him. The family division transferred custody of five-month-old G.L. to DCF, and the agency placed her in the home of foster parents N.G. and R.G. G.L. has lived with N.G. and R.G. continuously since that time.

¶ 3. Mother and father stipulated that G.L. was CHINS at the time of the State's petition because her half-brother sustained unexplained injuries while in their care and violence in the household had previously interfered with the family's home life. In July 2020, the trial court adopted a disposition case plan calling for mother to, among other things, work with psychiatry, medication-management, and counseling providers to address her aggressive behavior toward others and attend all scheduled visits with G.L.

¶ 4. The State filed a petition to terminate parents' rights in G.L. in March 2021. Mother was represented by Attorney Paul Groce, and the State was represented by Assistant Attorney General Wendy Burroughs. Attorney Groce requested discovery of "the DCF file [o]n [G.L.]," and Attorney Burroughs responded that he could inspect and photocopy it at DCF's district office in St. Albans. The file Attorney Groce reviewed there appeared to him to be complete. It did not contain records from the DCF Residential Licensing and Special Investigations Unit (RLSI), which is responsible for licensing foster homes. As a matter of course, RLSI stores its records at DCF's central office in Waterbury, not within the juvenile files maintained by DCF's district offices. Among RLSI's files were records pertaining to N.G. and R.G., including their prior licensing applications dating back to 2008 and documentation of two investigations conducted by RLSI in

2

2011. One of these investigations was prompted by an allegation that a child in N.G.'s care took Percocet pills after being left unsupervised with access to the medication.[2]

¶ 5. The family division held a contested hearing on the State's termination petition in October and November 2021. During the first day of the hearing, mother testified that she told an unidentified DCF worker she thought N.G.'s feet resembled those of a drug user, and the worker responded by attributing their appearance to N.G.'s health issues. Attorney Groce learned of this for the first time when he heard his client's testimony. However, he did not investigate the allegation further or pursue it during his examination of either mother or N.G.

¶ 6. The DCF worker assigned to G.L.'s case also testified at the termination hearing. At the time, she had been involved in the case for only two months. She explained that she had observed G.L. in her foster home and that DCF had no concerns about the ability of N.G. and R.G. to meet G.L.'s needs.

¶ 7. On December 22, 2021, the family division issued a written order terminating parents' rights in G.L.[3] It found that mother continued to demonstrate volatile behavior in her interactions with others, including in G.L.'s presence, and was either unwilling or unable to maintain consistent contact with G.L., frequently missing their scheduled visits. The court therefore concluded that mother had stagnated in her progress toward the case-plan goals and considered whether it was in G.L.'s best interests to terminate parental rights under the factors set forth at 33 V.S.A. § 5114(a). It determined that the most important of these—the parents' ability

---

[2] In its decision on mother's motion for relief from judgment, the family division made no findings regarding the second investigation, noting that the related documentation was not admitted into evidence because DCF questioned the credibility of the juvenile complainant.

[3] As the State notes, the December 2021 order was not included in the appeal volume. But see V.R.A.P. 1(c)(7) (explaining that appeal volume contains "all the documents filed and created in the trial court proceeding that are contained in the electronic case file"). The order is nonetheless part of the record on appeal. V.R.A.P. 10(a)(3) (providing that record on appeal includes "the record of actions from the superior court").

to resume or assume parental duties within a reasonable time from the perspective of G.L.— weighed in favor of termination. Though G.L. had been in DCF custody for over twenty-five months, it was still uncertain when mother would be able to resume parenting given her lack of consistent contact with G.L., ongoing struggle to regulate her emotions in interpersonal relationships or appreciate the impact of this behavior on G.L., and the "substantial work" that remained for mother to demonstrate the skills necessary to effectively parent. Relative to the other § 5114(a) factors, among other things, the court noted that G.L. had strong bonds with N.G. and R.G., who provided her with consistency and stability, met her needs, and hoped to adopt her if she was freed for adoption.

¶ 8. Mother appealed the termination order to this Court, where DCF was represented by Assistant Attorney General Julianne Woolard. In the spring of 2022, while the appeal was pending, RLSI was tasked with performing a relicensing investigation for N.G. and R.G. in anticipation of possible adoption proceedings and because their three-year foster license was nearing its expiration date. DCF had recently learned that R.G. had a prescription for the substance-use-disorder treatment medication Suboxone. R.G.'s physician informed DCF that R.G. was doing very well in treatment, and RLSI did not perceive any related safety risk to G.L. However, the licensing unit sought more specific information on this subject, including R.G.'s urinalysis results.

¶ 9. On June 17, 2022, while the RLSI investigation was ongoing, a three-Justice panel of this Court affirmed the termination order. See In re G.L., No. 22-AP-004, 2022 WL 2189545 (Vt. June 17, 2022) [https://perma.cc/SGL8-5WWE], cert. denied, 143 S. Ct. 811 (2023). By late July, R.G. had yet to sign an unlimited release to allow DCF access to his urinalysis results. He also asked what would happen if his results were not all negative. Though RLSI does not automatically deny relicensing applications solely because of substance use in a household, R.G.'s question and his reluctance to sign the release raised "red flags." However, DCF ultimately

4

obtained R.G.'s urinalysis results and, as late as August 2022, was still contemplating granting the licensing renewal.

¶ 10. RLSI ultimately discovered that in prior relicensing applications, N.G. and R.G. failed to disclose R.G.'s history with alcohol and related relapse or his ongoing substance-use-disorder treatment. By the end of August, RLSI formulated support to deny the pending application based on the foster parents' pattern of omission and nondisclosure over the years and warned the district office of the possible need to remove G.L. from their household. RLSI issued its decision denying the relicensing application on September 2, 2022. There was no evidence that R.G.'s alcohol use or substance-use-disorder treatment impacted G.L.; instead, RLSI's decision was based on the family's lack of transparency with DCF about these issues.

¶ 11. As a result of RLSI's nonrenewal, DCF determined that it would no longer be possible for N.G. and R.G. to adopt G.L. and began making plans to identify and move her to a placement that could offer permanency. In response, G.L.'s attorney requested that the court issue an order placing her in the conditional custody of N.G., with a long-term goal of establishing permanent guardianship. At a hearing on the motion, DCF indicated that it did not believe a permanent guardianship was possible because parents' rights had been terminated. Noting that the assigned DCF worker had no immediate concerns for G.L.'s safety in her current placement, the court issued a conditional custody order allowing her to remain in the home of N.G. and R.G. while DCF explored other options.

¶ 12. Mother and father were removed as parties to the family division proceedings after the termination order was affirmed. However, at some point, DCF inadvertently sent one or more documents to Attorney Groce disclosing the agency's concerns about the foster family and attendant change in position regarding adoption. In January 2023, prompted by this discovery, mother filed a motion for relief from the termination order under 33 V.S.A. § 5113(b) or, in the alternative, § 5113(a) and Vermont Rule of Civil Procedure 60(b).

5

¶ 13. Section 5113 "delineates when an existing order in a child-neglect proceeding may be modified." In re A.W., 2013 VT 107, ¶ 4, 195 Vt. 226, 87 A.3d 508. Under 33 V.S.A. § 5113(b), the family court "may amend, modify, set aside, or vacate an order on the grounds that a change in circumstances requires such action to serve the best interests of the child." Mother asserted that the court should set aside the termination order under this provision because there had been a change in circumstances warranting consideration of whether it was in G.L.'s best interests to reinstate mother's rights to pursue reunification or, in the alternative, facilitate G.L. being placed under the permanent guardianship of N.G. and R.G. Section 5113(a), on the other hand, provides that a family division order may be set aside in accordance with Civil Rule 60, which permits courts to relieve a party from an order for one of six enumerated reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud; (4) the judgment is void; (5) the judgment has been satisfied or released; or (6) "any other reason justifying relief from the operation of the judgment." V.R.C.P. 60(b); 33 V.S.A. § 5113(a). Rule 60(b)(6), the "so-called catchall provision[,] . . . allows the trial court to relieve a party from a final judgment for any reason beside those set forth in the first five sections of the rule"—including fraud on the court. Hill v. Springfield Hosp., 2023 VT 23, ¶ 20, __ Vt. __, 297 A.3d 504; Godin v. Godin, 168 Vt. 514, 517-18, 725 A.2d 904, 907 (1998). Mother alternatively argued that the termination order should be set aside under § 5113(a) and Rule 60(b)(6) because DCF may have engaged in fraud on the court by withholding information about G.L.'s foster home or because relief was otherwise justified by the circumstances of the case.[4]

---

[4] Mother also alleged that R.G.'s substance-use-disorder treatment constituted "newly discovered evidence" under Rule 60(b)(2). However, as mother later conceded, this argument was time-barred because her motion was filed more than a year after the termination order was entered. See V.R.C.P. 60(b) ("The motion shall be filed within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken.").

¶ 14. At a preliminary hearing on March 8, 2023, the family division indicated that it believed mother was limited to her fraud-on-the-court theory because this Court has held that § 5113(b) does not apply to orders terminating parental rights. However, it reserved judgment on this point and permitted mother to file a supplemental memorandum of law in support of her alternative theories of relief. Mother filed her memorandum on this issue on March 20. She acknowledged our precedent holding that § 5113(b) does not apply to termination orders and did not press her argument under that provision. However, she maintained that the court could nonetheless consider, under § 5113(a) and Rule 60(b)(6), whether vacating the termination order was in G.L.'s best interests given a change in circumstances.

¶ 15. The next hearing was held shortly after mother filed her supplemental memorandum. The court indicated that it had not yet had an opportunity to review the filings in depth given the parties' extensive motion practice during the preceding week. The parties instead discussed the judge's upcoming transition to another courthouse and several outstanding discovery issues, and the court ordered mother to file an amended motion setting forth her fraud-on-the-court claim with greater particularity following the completion of discovery.

¶ 16. Mother filed the amended motion relative to her fraud-on-the-court claim on April 28. She presented a multifaceted theory, arguing that DCF engaged in fraud on the court by either knowingly or recklessly: storing RLSI records in a manner that frustrated parents' efforts to obtain information about foster homes pertinent to termination proceedings; offering false evidence, through the DCF worker, that G.L.'s foster home was suitable during the hearing on the State's termination petition; failing to disclose the existence of negative information about N.G. and R.G. in response to mother's discovery request, to the family division, or to this Court during the appeal; and neglecting to raise its concerns with the family division until after parents were no longer parties to the case.

¶ 17.    A second judge held an evidentiary hearing on mother's motion over five days between May and October of 2023.  The court excluded certain evidence mother sought to offer in support of her argument that changed circumstances warranted reconsideration of whether it was in G.L.'s best interests to reinstate mother's rights.  The court held that this evidence was inadmissible under the law-of-the-case doctrine because the first judge concluded that mother was limited to her fraud-on-the-court claim as a matter of law.  It also denied mother's post-hearing motion to reopen the evidence.

¶ 18.    In December 2023, the family division issued a written decision including the following factual findings.  DCF's practice of storing RLSI records separately was logically supported by the agency's view of the distinct function of RLSI as compared with DCF's district offices, as well as DCF's understanding of the privacy laws applicable to foster parent records, including the federal Health Insurance Portability and Accountability Act.  See 42 U.S.C. § 1320d-6 (barring wrongful disclosure of individually identifiable health information by covered entities).  The siloing of this information was "merely a bureaucratic choice" based on these considerations, and "not some deliberate plan to hide relevant information from parents" in connection with termination proceedings.

¶ 19.    Although Attorney Groce was unaware of the RLSI records, notice of their existence was posted on DCF's public website, and other attorneys who represent parents and children in termination proceedings know that these records exist and can seek access by requesting them, asking that the foster parents sign releases, or moving the court to order their disclosure.  Attorney Groce did not undertake these efforts, even after hearing his client's testimony regarding her observations of N.G.'s feet at the first day of the termination hearing.  He also chose not to question any of the witnesses about this issue.

¶ 20.    When RLSI discovered that N.G. and R.G. failed to disclose information about R.G.'s substance use and treatment in prior licensing applications, it "treated the matter as a

8

question of relicensing and proceeded accordingly." It did not calibrate its investigation in relation or response to the underlying termination proceeding. At the time the termination order was affirmed, RLSI had not decided whether to grant the relicensing application. It was still attempting to obtain more information from N.G. and R.G. Moreover, the RLSI investigator did not become aware of the 2011 investigation records until August 2022, as her investigation approached its conclusion, because relicensing investigations usually focus on the three-year period following the most recent license renewal.

¶ 21. The family division found it highly unlikely that the DCF worker knew of the adverse information about N.G. and R.G. in the licensing file during her testimony at the termination hearing. The DCF worker did not learn of DCF's concerns about R.G.'s substance use and treatment until late July or early August 2022, after the termination order had been affirmed on appeal. At that point, her focus was on how to address the situation so that G.L. could remain in the only home she had ever known, given that there was no evidence that her care was ever compromised by R.G.'s substance-use disorder or treatment. In fact, by the conclusion of the hearings on mother's motion for relief from judgment, the DCF worker indicated that DCF once again supported G.L.'s adoption by N.G. and R.G.

¶ 22. Attorney Burroughs was not aware of the negative information in the RLSI records until after the oral argument in mother's appeal. Though she first learned of RLSI's emerging concerns in May or June 2022, the discussion at that point was limited to the unit's need for more detailed information regarding N.G. and R.G. in connection with its relicensing investigation. Attorney Burroughs did not know that RLSI was leaning toward denying the application until late July 2022. Attorney Woolard did not learn of either the information in the RLSI records or any circumstances connected with the relicensing denial until after the termination order was affirmed on appeal. At this point, DCF could not disclose the information because the termination and appeal proceedings had concluded.

¶ 23. The court rejected mother's argument that the outcome of the termination proceeding and subsequent appeal could have been different if information about the foster family had been revealed to mother and the family division earlier. Though the court credited Attorney Groce's testimony that he would have explored the issues through cross-examination of the foster parents had he known of them at the time of the termination hearing, it noted that G.L.'s relationship with her foster family and the availability of an adoptive home were not dispositive considerations in the termination of mother's rights. It reasoned that even if the trial court had heard evidence of the foster family's dishonesty about R.G.'s drug treatment and relapse, it would bear only on their credibility.

¶ 24. The family division explained that fraud on the court is found only in extraordinary circumstances where the integrity of the judicial process is subverted through an unconscionable scheme or plan. It concluded, based on the findings described above, that mother failed to meet her burden of proof on this point and denied her motion to set aside the termination order. See Merchs. Nat'l Bank of New Bedford v. Considine, 135 Vt. 416, 418, 377 A.2d 1390, 1392 (1977) ("The burden of proof in a Rule 60(b) motion is upon the moving party."). This appeal followed.

I.      Exclusion of Evidence Relevant to Alternate Grounds for Relief

¶ 25. We begin with mother's challenge to the court's exclusion of evidence under the law-of-the-case doctrine. She contends that this was error because the first judge did not expressly rule on her alternative arguments that the termination order could be set aside under § 5113(b) or § 5113(a) and Rule 60(b)(6) because G.L.'s circumstances had changed and it was in her best interests to reinstate mother's parental rights.[5]

¶ 26. We review a ruling excluding evidence for abuse of discretion, In re K.S., 2021 VT 51, ¶ 31, 215 Vt. 205, 260 A.3d 387, finding reversible error only where "a substantial right of the

---

[5]  To the extent mother suggests that the exclusion of this evidence was error because it was also relevant to her fraud-on-the-court claim or because 33 V.S.A. § 5101(a)(4) provides that

10

party is affected." V.R.E. 103(a). As discussed above, the record reflects that the court invited mother to submit additional briefing on the two arguments at issue here. In her March 20 memorandum, mother abandoned her § 5113(b) argument, but contended that equivalent relief was nonetheless available under § 5113(a) and Rule 60(b)(6). There is no indication that the first judge ever issued the anticipated ruling on this point. As a result, the law-of-the-case doctrine was not a basis to exclude the evidence mother offered.[6] See Fabiano v. Cotton, 2020 VT 85, ¶ 20, 213 Vt. 236, 249 A.3d 1268 (concluding that law-of-the-case doctrine did not bar ruling on motion to modify following pretrial hearing before different judge because prior judge's statements reflected intent to reserve decision on issue). Although the court's reasoning was incorrect, its ruling is not grounds for reversal. The exclusion of evidence relative to changed circumstances and best interests had no impact on mother's substantial rights because both related arguments were unavailing as a matter of law.[7]

¶ 27. As the trial court noted, we have repeatedly held that § 5113(b) is inapplicable to termination orders. See In re C.L., 2021 VT 66, ¶ 32, 215 Vt. 341, 263 A.3d 745; ("[O]ur case law clearly establishes that § 5113(b) does not apply to termination orders."); In re P.K., 2017 VT 3, ¶ 15, 204 Vt. 102, 164 A.3d 665 ("[W]e reaffirm our holding that § 5113(b) does not apply to an order terminating parental rights." (quotation omitted)); In re A.W., 2013 VT 107, ¶ 13, 195

---

the juvenile judicial proceedings statute should be construed "to ensure that safety . . . for children" is a "paramount concern[]," we do not consider these arguments because they were raised for the first time in her reply brief. See Robertson v. Mylan Lab'ys, Inc., 2004 VT 15, ¶ 2 n.2, 176 Vt. 356, 848 A.2d 310 ("We need not consider an argument raised for the first time in a reply brief.").

[6] The State contends that mother waived all alternative arguments raised in her original motion by filing her April 28 amended motion setting forth her fraud-on-the-court claim with greater particularity. Mother's amended motion merely clarified the basis for her fraud-on-the-court claim following discovery, as ordered by the court, and did not supersede her prior filings or operate as a waiver of her alternative arguments.

[7] For this reason, we need not consider whether mother waived her § 5113(b) argument when she failed to address it in her March 20 memorandum.

Vt. 226, 87 A.3d 508 ("Because the termination order was not subject to father's motion to modify based on changed circumstances, the trial court properly dismissed it."). This conclusion stems from two closely related considerations. First, by legislative design, an order terminating parental rights occupies a "unique" role in child-neglect proceedings. In re A.W., 2013 VT 107, ¶ 11. "Unlike other orders" the juvenile court may issue, "a termination decision is a permanent order" and "must be based on findings by clear and convincing evidence." Id.; 33 V.S.A. § 5231(c) (providing that to terminate parental rights, court must make findings by "clear and convincing evidence," while standard of proof for "all other issues" is preponderance of evidence); also compare, e.g., 33 V.S.A. § 5308(b) ("[T]he court may issue such temporary orders related to the legal custody of the child as it deems necessary and sufficient." (emphasis added)); id. § 5320a(a) (providing that "presumptive duration" of conditional custody order "shall be no more than six months from the date of the disposition order or the conditional custody order, whichever occurs later," unless extended by court after hearing for "additional period of time not to exceed six months"). Second, the Legislature has specified that the juvenile judicial proceedings chapters must be construed "to [en]sure that safety and timely permanency for children are the paramount concerns in the administration and conduct" of cases filed thereunder. In re A.W., 2013 VT 107, ¶ 10 (quoting 33 V.S.A. § 5101(a)(4)).

¶ 28.    Reading § 5113(b) in light of the Legislature's stated purpose of timely permanency for children, and accounting for the keystone function termination orders play in achieving that end, we concluded in In re A.W.—and reaffirmed in In re P.K. and In re C.L.—that the provision is inapplicable to termination orders. In re C.L., 2021 VT 66, ¶ 32; In re P.K., 2017 VT 3, ¶ 15; In re A.W., 2013 VT 107, ¶ 12. As a result, mother could not attain relief from the termination order based on alleged changed circumstances under § 5113(b). Considering the same principles expressed in those cases in connection with § 5113(a) and Rule 60(b)(6), we conclude that as a

12

matter of law, mother could no more raise her changed-circumstances argument under those provisions than she could pursuant to § 5113(b).

¶ 29.    Rule 60(b)(6) "is, by its very nature, invoked to prevent hardship or injustice," and therefore must "be liberally construed and applied." Cliche v. Cliche, 143 Vt. 301, 306, 466 A.2d 314, 316 (1983) (citing 11 C. Wright & A. Miller, Fed. Prac. and Proc. § 2864 (1973)). However, "it is not an open invitation to reconsider matters concluded at trial," Penland v. Warren, 2018 VT 70, ¶ 7, 208 Vt. 15, 194 A.3d 755 (quotation omitted); rather, it is reserved for only those "extraordinary situations" that "warrant the reopening of final judgments after a substantial period of time," Riehle v. Tudhope, 171 Vt. 626, 627, 765 A.2d 885, 887 (2000) (mem.). Thus, courts have recognized only "few narrowly-defined situations"—such as allegations of fraud on the court—"that clearly present 'other reasons justifying relief' " under Rule 60(b)(6). 11 C. Wright & A. Miller, Fed. Prac. and Proc. § 2864 (3d ed. 2024); see Godin, 168 Vt. at 518-19, 725 A.2d at 907-08.

¶ 30.    In identifying these rare scenarios, courts are "to be guided by accepted legal principles applied in light of all the circumstances." Cliche, 143 Vt. at 307, 466 A.2d at 317. Section 5113(a), like § 5113(b), must be construed in harmony with the other provisions of the juvenile judicial proceedings chapters. See In re C.L.S., 2021 VT 25, ¶¶ 13-14, 214 Vt. 379, 253 A.3d 443. Though mother argues that our holdings in In re C.L., In re P.K., and In re A.W. do not apply to a motion filed under § 5113(a) and Rule 60(b)(6), she fundamentally seeks the same relief those cases foreclosed under § 5113(b): the reconsideration of whether termination of her parental rights is in G.L.'s best interests given an intervening change of circumstances.

¶ 31.    Mother contends that this case is different because she sought the reinstatement of her parental rights to facilitate timely permanency for G.L. However, we have affirmed that the twin concerns animating our conclusion in In re A.W. "exist regardless of the timing or the basis for" a motion to set aside a termination order under § 5113(b). In re C.L., 2021 VT 66, ¶ 37; see

13

In re P.K., 2017 VT 3, ¶ 17 (rejecting attempt to distinguish In re A.W. on grounds that mother asserted changed circumstances based on child's best interests rather than improved parenting ability and holding that reasoning of In re A.W. "is generally applicable to all termination orders, regardless of the basis for the alleged changed circumstances"). As we explained in In re A.W., "[t]here is a time for permanence for children," and "[i]t would indefinitely expand the termination process and abolish the intended permanency of a termination-of-parental-rights order" in all cases "if a parent could seek to modify the order based on changed circumstances." 2013 VT 107, ¶ 12.

¶ 32. This reasoning is no less germane to a motion for relief from a termination order based on changed circumstances under Rule 60(b)(6). In fact, there is a precise congruence between the "particularly great" need for finality we have recognized in termination cases, In re P.K., 2017 VT 3, ¶ 13, and the requirement that, in discerning the limits of Rule 60(b)(6) relief, "[w]e must be concerned about the certainty and finality of judgments so that litigation can reach an end," Richwagen v. Richwagen, 153 Vt. 1, 4, 568 A.2d 419, 421 (1989). While Rule 60(b)(6) must be liberally applied, the "interests of finality necessarily limit when relief is available" thereunder. McCleery v. Wally's World, Inc., 2007 VT 140, ¶ 10, 183 Vt. 549, 945 A.2d 841 (mem.) (quotation omitted); see also, e.g., In re A.W., 2013 VT 107, ¶ 8 (explaining that motion to modify prior termination decision based on changed circumstances does not share the "compelling policy reasons" that allow for a motion to set aside on grounds of fraud under § 5113(a) and Rule 60(b)). In considering those limits, we are guided by the well-established legal principle that allowing a parent to seek modification of a termination order based on changed circumstances of any type "would preclude a termination order from ever becoming truly final, thus denying the timely permanency to the child that the Legislature specifically desired." In re A.W., 2013 VT 107, ¶ 12; see also Cliche, 143 Vt. at 307, 466 A.2d at 317.

¶ 33. There was no legal basis for mother to set aside the order under either § 5113(a) and Rule 60(b)(6) or § 5113(b). As a result, the exclusion of evidence she sought to offer in support of these theories was not reversible error. See V.R.E. 103(a).

## II. Motion to Reopen Evidence

¶ 34. Next, we consider mother's argument that the trial court erred in denying her motion to reopen the evidence. She filed this motion after the court closed the evidence at the conclusion of the fifth and final day of the hearing, and before the court issued its decision. She moved for permission to call a family support worker who attended—but did not testify at—the hearings and had been working with mother through the Defender General's Office since January 2018. Based on the family support worker's proposed testimony, mother also sought leave to recall the DCF worker who testified at both the termination hearing and the hearing on mother's motion for relief from judgment.

¶ 35. Mother's request was supported by the affidavit of the family support worker, which included the following allegations. During a virtual shared-parenting meeting the family support worker attended in the summer of 2021, she noticed a white substance under N.G.'s nose. She did not share this observation with DCF until an unspecified later date, after she became aware of concerns regarding substance use in the foster home. She did not inform mother's attorney until after the close of evidence at the hearing related to mother's motion for relief from judgment. During that hearing, the family support worker observed R.G. "nodding off." Immediately after the final day of the hearing in October 2023, the family support worker saw the other parties and attorneys "herded" out the door and overheard a member of the group she could not conclusively identify say the words, "good news to share." The family support worker exited the courthouse and, through an exterior window, saw that the group had gathered in an attorney conference room and was engaged in discussion that "appeared more collegial and celebratory" than she would have expected under the circumstances—though she noted that their expressions changed when they

15

realized that she was taking a video of them through the window. Attached were screenshots from this video.

¶ 36. In her motion, mother speculated that in the conference-room meeting, DCF may have announced that it was now willing to support G.L.'s adoption by N.G. and R.G., giving rise to suspicion that DCF had "misused its power to incentivize the other parties in the case to oppose [mother's] motion in exchange for an express or implied promise that it would support adoption" if the motion was denied. She also argued that the proffered evidence contradicted the DCF worker's sworn testimony that she had no reason to suspect that N.G. used substances or that R.G. had ongoing issues with substance use.

¶ 37. The court declined to reopen the evidence for several reasons. It found it "entirely unclear" why the proffered testimony was not raised at any other point during the proceedings, particularly because the gravamen of mother's argument was drug use by the foster family, and the family support worker attended all five days of the hearing. Moreover, it concluded that, even taking the family support worker's representations at face value, they were "highly anecdotal, unsupported by any other credible evidence adduced during the motion hearing[]" and outweighed by uncontradicted evidence that G.L. was never impacted in any way by substance use or treatment in the foster home. The court also noted the apparent lack of legitimate basis for the family support worker's decision to film a meeting among other parties and their attorneys in the courthouse's attorney conference room without their consent.

¶ 38. The trial court has "broad discretion" in ruling on a motion to reopen filed after the close of evidence but prior to final judgment, In re Bjerke Zoning Permit Denial, 2014 VT 13, ¶ 16, 195 Vt. 586, 93 A.3d 82, consistent with its mandate to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to . . . make the interrogation and presentation orderly and effective for the ascertainment of the truth" and "avoid needless consumption of time," V.R.E. 611(a). We will uphold the court's decision unless an

16

assessment of "the entirety of the reasoning behind the superior court's decision" reveals that it "withheld its discretion entirely" or exercised it "for clearly untenable reasons or to a clearly untenable extent." Bank of Am., N.A., v. O'Kelly, 2018 VT 71, ¶ 11, 208 Vt. 20, 194 A.3d 746 (quotation omitted).

¶ 39. Mother argues that the court abused its discretion in denying the motion because the proffered evidence supported her allegation that DCF was involved in an ongoing effort to conceal negative information about G.L.'s foster home and maintain the termination of mother's parental rights "at all costs." She asserts that the family support worker's testimony would have established that she informed the DCF worker of the powdery substance allegedly observed during the 2021 meeting, contravening the DCF worker's testimony that she had no evidence that N.G. had used drugs. However, the family support worker's affidavit made no reference to this DCF worker, and only alleged generally that the family support worker shared the information with DCF at an unspecified later time. In any event, mother does not explain why the court abused its discretion in assigning weight to her failure to come forward with this evidence earlier, its speculative nature, and the limits of its probative value when considered in connection with other evidence in the record. Her mere "disagreement with the court's reasoning and conclusion . . . do[es] not make out a case for abuse of discretion." Meyncke v. Meyncke, 2009 VT 84, ¶ 15, 186 Vt. 571, 980 A.2d 799 (mem.).

III.     Motion to Set Aside Termination Order for Fraud on the Court

¶ 40. Lastly, we consider mother's principal argument on appeal: that the family division erred in concluding that DCF did not perpetrate a fraud on the court and therefore denying her motion for relief from judgment. She contends that the trial court applied an incorrect standard in assessing her claim because it focused on the knowledge and intentions of each individual acting on DCF's behalf, rather than imputing all information in DCF's possession to the agency as a whole. In mother's view, when an organization perpetrates fraud on the court, it is unnecessary to

prove that it was purposefully orchestrated by any one individual; instead, conduct that recklessly disregards the risk of misleading the court is sufficient.

¶ 41. Whether the family division applied the correct standard in assessing mother's fraud-on-the-court claim is a question of law that we review without deference. Merchant v. Merchant, 2015 VT 72, ¶ 7, 199 Vt. 406, 124 A.3d 443 ("We review the legal conclusions of the . . . family division de novo.").

¶ 42. We consider mother's arguments regarding the applicable standard in the context of our existing case law regarding fraud on the court. We have recognized that "certain motions for relief from judgment alleging egregious fraud on the court in the underlying judgment" are governed by Rule 60(b)(6), and therefore fall outside the one-year time limit for motions for relief based on fraud under 60(b)(3). Olio v. Olio, 2012 VT 44, ¶¶ 17-18, 192 Vt. 41, 54 A.3d 510; see Godin, 168 Vt. at 518-20, 725 A.2d at 907-08. However, we have also stressed the constrained scope of this exception, explaining that the fraud-on-the-court doctrine " 'must be narrowly applied, or it would become indistinguishable from ordinary fraud, and undermine the important policy favoring finality of judgments.' " Olio, 2014 VT 44, ¶ 18 (quoting Godin, 168 Vt. at 518, 725 A.2d at 907); see also 12 J. Moore, et al., Moore's Federal Practice ¶ 60.21[4][c], at 60-55 (3d ed. 1997) ("If fraud on the court were to be given a broad interpretation that encompassed virtually all forms of fraudulent misconduct between the parties, judgments would never be final and the time limitations of Rule 60(b) would be meaningless.").

¶ 43. Our recognition of the exception was principally based on Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944), which we described as "[t]he seminal decision in this area." Godin, 168 Vt. at 518-19, 725 A.2d at 907 (applying standard articulated in Hazel-Atlas). There, the U.S. Supreme Court found that an attorney's "deliberately planned and carefully executed scheme to defraud" an appellate court by fabricating an article, falsely attributing it to an author, and then submitting it to receive a favorable judgment in a patent case was a "wrong against

18

the institutions set up to protect and safeguard the public" warranting exercise of the Court's equitable powers to set aside the "fraudulently begotten judgment[]." Hazel-Atlas, 322 U.S. at 245-46. We measure allegations of fraud on the court against the conduct at issue in Hazel-Atlas, thus distinguishing between "the type of egregious fraud on the court that triggers the exception" and fraud that—while perhaps worthy of censure by other means—does not rise to this level. Olio, 2012 VT 44, ¶ 22; see also id. ¶ 18 (explaining that in articulating standard, "[w]e specifically distinguished between cases involving witnesses who, on the basis of after-discovered evidence, are believed to have been guilty of perjury, and those involving the kind of wrong described . . . in . . . Hazel-Atlas"); Godin, 168 Vt. at 519, 724 A.2d at 908 ("A finding of fraud on the court is justified only by the most egregious misconduct directed to the court itself, such as . . . fabrication of evidence by counsel." (quotation omitted)).

¶ 44.    Consistent with our narrow application of the doctrine, we have repeatedly used language suggesting that fraud on the court necessarily involves a deliberate effort to subvert the judicial process. We have variously described it as "a course of intentional and successful deception and conduct by a person in respect to a matter in court which result[s] in a perversion and obstruction of justice," Leno v. Meunier, 125 Vt. 30, 35, 209 A.2d 485, 490 (1965) (emphasis added), and a "calculated design to improperly influence the court," Godin, 168 Vt. at 519, 725 A.2d at 908 (emphasis added). We have affirmed its existence in few circumstances, such as where two signatories to a voluntary acknowledgement of parentage "knowingly misrepresented [a party] to be the child's biological father." McGee v. Gonyo, 2016 VT 8, ¶ 9, 201 Vt. 216, 140 A.3d 162 (emphasis added).

¶ 45.    Mother cites a Sixth Circuit case, Carter v. Anderson, for the proposition that fraud on the court may arise not just from conduct that is "intentionally false," but also from conduct that is "willfully blind to the truth[] or is in reckless disregard for the truth." 585 F.3d 1007, 1011 (6th Cir. 2009). As the Second Circuit recently explained, the Sixth Circuit stands alone in

19

applying a recklessness standard, and the other federal appellate courts that have addressed the issue generally require proof of an intentional fraud. Mazzei v. The Money Store, 62 F.4th 88, 95 (2d Cir. 2023) (rejecting proposed recklessness standard and requiring that proponent of fraud-on-the-court claim prove bad faith); see also United States v. Sierra Pac. Indus., Inc., 862 F.3d 1157, 1172 (9th Cir. 2017) (explaining that fraud on the court must be shown through "willful deception rather than simply reckless disregard for the truth"); Herring v. United States, 424 F.3d 384, 386 (3d Cir. 2005) (requiring demonstration of "an intentional fraud" on the court); Robinson v. Audi Aktiengesellschaft, 56 F.3d 1259, 1267 (10th Cir. 1995) (rejecting suggestion that statements made with reckless disregard for truth can form basis of fraud on court and requiring showing of "intent to deceive or defraud"), cert. denied, 516 U.S. 1045 (1996); Wilson v. Johns-Manville Sales Corp., 873 F.2d 869, 872 (5th Cir. 1989) (requiring proof of "unconscionable plan or scheme . . . designed to improperly influence the court" (quotation omitted)); Great Coastal Express, Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., 675 F.2d 1349, 1356 (4th Cir. 1982) (requiring proof of "deliberate scheme to directly subvert the judicial process").

¶ 46.    Mother fails to acknowledge that the recklessness standard she cites is an outlier among federal jurisdictions or that it contravenes the language employed in our prior decisions, which rely heavily on cases from those circuits that have concluded that a reckless mental state is insufficient to support fraud on the court. See, e.g., Godin, 168 Vt. at 520, 725 A.3d at 908 (citing Great Coastal Express, 675 F.2d at 1356, and Wilson, 873 F.2d at 872); see also Levinsky v. State, 146 Vt. 316, 318, 503 A.2d 534, 536 (1985) (per curiam) (noting that "we turn to decisions of the federal courts" for guidance on the parameters of V.R.C.P. 60(b)(6)).  Instead, she suggests that the standard is particularly apposite here because DCF is a government agency and termination proceedings implicate fundamental rights to family integrity.  As such, she argues, the key question is "what the agency knew and when the agency knew it," and it is unnecessary to show that any

20

one individual knowingly orchestrated a fraud on the court or that DCF's attorneys intentionally presented false evidence.

¶ 47.    Mother cites In re Brannan, 485 B.R. 443, 450 (Bankr. S.D. Ala. 2013), for the proposition that an organization commits fraud on the court where it fails to establish a procedure to ensure that the facts presented to the court are true and accurate.  In that case, a putative class of debtors alleged that a mortgage company—through its employees and attorneys—perpetrated fraud on the court in numerous bankruptcy proceedings by preparing and filing affidavits that were neither carefully reviewed by all affiants nor notarized in compliance with the applicable state law. The Bankruptcy Court concluded that these allegations, if proven, were "a basis for remedial action based on fraud on the court" because "[t]he affidavits, if prepared as alleged, were at least recklessly prepared under counsel's direction and submitted by counsel to the court to obtain relief."  Id. at 452-53 (emphasis added).  Because this analysis hinged on the court's application, without any supporting analysis, of the scienter requirement the Sixth Circuit set forth in Carter, it offers little additional support for mother's argument.  Id. at 453 (citing Carter, 585 F.3d at 1011). Indeed, we note that the Southern District of Alabama is part of the Eleventh Circuit, which has observed that its precedent regarding fraud on the court "requires the demonstration of a plan or scheme . . . designed to improperly influence the court, which indicates that scienter is required." In re Baron's Stores, Inc., 307 Fed. App'x 396, 397-98 (11th Cir. 2009) (concluding that, to extent movants suggested recklessness conduct satisfied this requirement, claim had not been preserved for appeal) (quotation omitted).

¶ 48.    Mother also argues that Demjanjuk v. Petrovsky supports the conclusions that where a government agency is alleged to have engaged in fraud on the court, it cannot raise a " 'the-right-hand-did-not-know-what-the-left-hand-was-doing' argument" in defense, and it is irrelevant whether any individual representative of the agency was acting in good faith.  10 F.3d 338, 353 (6th Cir. 1993).  In Demjanjuk, the court appointed a special master to investigate whether

21

U.S. Department of Justice attorneys engaged in fraud on the court when they failed to disclose exculpatory information in their possession during a habeas corpus proceeding in which the petitioner sought to prevent his extradition to Israel, where he faced capital charges of murder. The evidence in the government attorneys' possession supported the petitioner's primary defense—that he had been misidentified as a Nazi war criminal who shared his first name. The special master issued a report concluding that "the intent requirement 'is satisfied by proof of an actual intent to defraud, of wil[l]ful blindness to the truth, or of a reckless disregard for the truth.' " Id. at 348 (citation omitted) (emphasis omitted).

¶ 49.    The Sixth Circuit explained that "[a]lthough there are cases holding that a 'plan or scheme' must exist in order to find fraud on the court, we agree with [the special master] that a scheme, based on a subjective intent to commit fraud, is not required in a case such as this. Reckless disregard for the truth is sufficient."[8] Id. at 352-53.  The court went on to explain the circumstances that made application of the recklessness standard appropriate in this instance.  It concluded that where the government seeks denaturalization or extradition based on proof of alleged criminal activities, its attorneys have a duty to disclose exculpatory evidence in their possession akin to that imposed by the U.S. Supreme Court in Brady v. Maryland in criminal cases on the premise that, " 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' "  Id. at 353 (quoting Brady v. Maryland, 373 U.S. 83, 87 (1963)) (observing that the Department of Justice attorneys "presented

---

    [8] We note that the Sixth Circuit in Carter drew the general recklessness standard directly from Demjanjuk, though it did not acknowledge Demjanjuk's holding that application of the standard was appropriate because of the singular details of that case.  Carter, 585 F.3d at 1011; see also, e.g., D. Roy, The Sixth Circuit's Unprecedented Reopening of Demjanjuk v. Petrovsky, 42 Clev. St. L. Rev. 737, 745 (1994) (explaining that Demjanjuk is factually and procedurally unique).

their case as showing that Demjanjuk was guilty of mass murder"). The Sixth Circuit characterized the attorneys' conduct as "prosecutorial misconduct that seriously misled the court." Id. at 339.

¶ 50. This case is not like Demjanjuk. Although mother argues that public-policy considerations favor a fraud-on-the-court standard that compels DCF's full disclosure of all evidence concerning the safety and suitability of a preadoptive placement for a child in state custody, she does not contend that her due-process rights demand it. In analyzing mother's public-policy argument, we recognize that fundamental rights are at stake in termination proceedings and that weighty obligations fall on counsel for the State. See In re A.D., 143 Vt. 432, 435-36, 467 A.2d 121, 124 (1983) (recognizing that "[w]hen the State intervenes in the area of child neglect," parents' "fundamental interest[] . . . in maintaining family integrity" is implicated); see also In re L.H., 2018 VT 4, ¶ 24, 206 Vt. 596, 182 A.3d 612 (explaining that attorneys "advising and representing the State in abuse-and-neglect cases" have duty to do so "in an effort to advance the best interests of the children in a way that is fair and just to all concerned"). But mother has not established that these considerations mandate deviation from the standard we have applied to every other fraud-on-the-court case before us—the standard that prevails in the majority of federal courts. See, e.g., United States v. Sierra Pac. Indus., 100 F. Supp. 3d 948, 960 (E.D. Cal. 2015), aff'd sub nom. Sierra Pac. Indus., 862 F.3d 1157 ("The Supreme Court and Ninth Circuit have repeatedly analyzed claims of fraud on the court by government attorneys without suggesting that their conduct is to be evaluated in light of any heightened obligations." (collecting cases)).

¶ 51. Mother cites Division of Family Services v. S.P., 120 A.3d 26 (Del. Fam. Ct. 2015), in which a Delaware family court held that the Division of Family Services mistakenly interpreted a state statute as requiring full review and disclosure of only reports of abuse by prospective adoptive parents that had been substantiated. This conclusion rested on the court's interpretation of the relevant statute, which was informed, among other things, by the recognition of a legislative policy favoring disclosure. Id. at 32. However, the decision referenced fraud on the court only

23

equivocally, noting that if the Division had asked an adoptive father about prior allegations of child abuse, and if the father failed to disclose such reports, the "adoption could be seen as the product of a fraud upon the Court and[,] potentially, voided or vacated." Id. at 29. This passing observation, pertaining to the conduct of an adoptive parent rather than the relevant child-protection agency, does nothing to advance mother's public-policy argument.

¶ 52. Relatedly, mother asserts that without full access to the information in DCF's possession regarding the foster parents, it was impossible for the court to make an "accurate determination" regarding whether to terminate her parental rights. As the trial court recognized, however, issues pertaining to N.G. and R.G. were ancillary to the determination of whether mother's parental rights should be terminated. "[A] termination proceeding is not a custody case in which the family court must balance the respective advantages of different placement options, but rather a legislatively created proceeding in which the court is required to weigh specified statutory factors" in determining whether to terminate parental rights. In re R.B., 2015 VT 100, ¶ 20, 200 Vt. 45, 126 A.3d 496 (quotations and alteration omitted); see also 33 V.S.A. §§ 5113(b), 5114(a). It is true that a child's adjustment to home, school, and community, and "interaction and interrelationship" with "any . . . person who may significantly affect the child's best interests," including "foster parents, if any," are among these factors. 33 V.S.A. § 5114(a)(1), (2). But they are not dispositive: the most important factor, as the court recognized in its termination order, is whether the parent will be able to resume parenting duties within a reasonable time. In re C.P., 2012 VT 100, ¶ 30, 193 Vt. 29, 71 A.3d 1142; see 33 V.S.A. § 5114(a)(3).

¶ 53. Thus, "we have repeatedly stated 'that a valid termination of parental rights does not depend on the availability of permanent foster care or adoption.' " In re S.B., 174 Vt. 427, 430, 800 A.2d 476, 480-81 (2002) (mem.) (quoting In re D.M., 162 Vt. 33, 40, 641 A.2d 774, 778 (1994)); see also In re R.B., 2015 VT 100, ¶ 19 ("Any question about the children's placement has no bearing on whether the court erred in terminating parents' rights."); In re L.A., 154 Vt. 147,

160, 574 A.2d 782, 789 (1990) (noting that absence of statutory "requirement for an alternative placement is reasonable since the termination of parental rights may be necessary to allow the children to bond to a new family"). Given how far removed any information pertaining to a child's foster placement is from the pivotal issues in a termination proceeding, this policy argument does not support mother's contention that the case should be analyzed under a different standard. See, e.g., United States v. Est. of Stonehill, 660 F.3d 415, 452 (9th Cir. 2011) (observing that "in nearly all fraud-on-the-court cases, the misrepresentations went to the central issue in the case," and declining to find fraud on the court where "the government's misrepresentations were relatively few" and "largely tangential" to fundamental questions presented).

¶ 54. Mother notes that Vermont Rule for Family Proceedings 2(d)(6) provides that, "[u]pon the filing of a petition, a party's attorney shall be permitted to inspect or photocopy all material or information within the possession, custody or control of [DCF] which relates to the child, the parent(s), the guardian(s), or which is otherwise relevant to the subject matter of the proceedings," although any party or DCF may move for a protective order. She contends that under the Rule, DCF has a duty to either disclose the information in RLSI files on request or move for a protective order, and that this obligation promotes child safety by limiting DCF's ability to conceal information about foster parents that might undermine the agency's position. However, mother does not explain why the existence of Rule 2(d)(6) should impact the analysis of her fraud-on-the-court claim.[9] Even accepting, for the sake of argument, that Attorney Burroughs was

---

[9] Similarly, mother cites provisions of the Rules of Professional Conduct which provide that a lawyer may not "fail to correct a false statement of material fact . . . previously made to the tribunal by the lawyer," V.R.Pr.C. 3.3(a)(1), or "unlawfully obstruct another party's access to evidence," V.R.Pr.C. 3.4(a), but she does not bridge the gap between this language and her fraud-on-the-court argument. The Rules are "designed to provide guidance to lawyers" and "a structure for regulating conduct through disciplinary agencies," and expressly provide that nothing therein "should be deemed to augment or diminish any substantive legal duty of lawyers or the extradisciplinary consequences of violating such a duty." V.R.Pr.C. Scope. As a result, it is not clear how they can have any bearing on the standard applicable to a fraud-on-the-court claim, even assuming mother is correct in contending that they were violated.

required to provide Attorney Groce with the RLSI records pertaining to R.G. and N.G. in response to his request for "the DCF file [o]n [G.L.]," "the mere nondisclosure to an adverse party and to the court of facts pertinent to a controversy before the court does not add up to fraud upon the court for purposes of vacating a judgment under Rule 60(b)." Godin, 168 Vt. at 520, 725 A.2d at 908 (quotation omitted); see also Stonehill, 660 F.3d at 452 (proponents of fraud-on-the-court claim "must show more than perjury or nondisclosure of evidence, unless that perjury or nondisclosure was so fundamental that it undermined the workings of the adversary process itself"); Bulloch v. United States, 763 F.2d 1115, 1121 (10th Cir. 1985) ("[A]llegations of nondisclosure in pretrial discovery will not support an action for fraud on the court.").

¶ 55. We conclude that in Vermont, a claim of fraud on the court demands a corresponding showing of intent to deceive by an individual actor or group of actors, regardless of the identity of the parties or the character of the legal issues involved. As the Tenth Circuit aptly explained:

> We think it clear that "fraud on the court," whatever else it embodies, requires a showing that one has acted with an intent to deceive or defraud the court. A proper balance between the interests underlying finality on the one hand and allowing relief due to inequitable conduct on the other makes it essential that there be a showing of conscious wrongdoing—what can properly be characterized as a deliberate scheme to defraud—before relief from a final judgment is appropriate under the Hazel–Atlas standard. Thus, when there is no intent to deceive, the fact that misrepresentations were made to a court is not of itself a sufficient basis for setting aside a judgment under the guise of "fraud on the court."

Robinson, 56 F.3d at 1267. This reasoning squares with the jurisprudential origins of our doctrine and the principles of finality we have centered in every case applying the standard. See Olio, 2012 VT 44, ¶ 22 (explaining that "[i]n crafting our approach to [fraud-on-the-court] cases, we have struck a balance between the competing imperatives of finality of judgments, on the one hand, and

justice in every case on the other"). The trial court did not err in applying that same standard to mother's fraud-on-the-court claim.[10]

¶ 56. Mother does not challenge the court's factual findings, which amply support its conclusion that DCF did not engage in any deliberate effort to deceive the court in connection with the underlying termination proceedings. Moreover, as the court found, the information at issue had no bearing on the primary considerations it weighed in ordering termination of mother's parental rights. Regardless of G.L.'s current placement, mother failed to progress in key aspects of her case plan and there was no indication that she would be able to resume parenting within a reasonable time from the perspective of a child who had been in DCF custody for most of her young life. Mother's motion to set aside the termination order was appropriately denied.

Affirmed.

FOR THE COURT:

_____
Associate Justice

---

[10] It is not entirely clear whether mother also contends that the trial court erred in denying her motion under this standard. Though mother sets forth the abuse-of-discretion standard applicable to an assertion that the trial court erred in declining to grant relief under Rule 60(b)(6), she makes no explicit accompanying argument. See V.R.A.P. 28(a)(4)(B) (providing that appellant's principal brief must include "a concise statement of the applicable standard of review" for each issue presented); In re C.L.S., 2021 VT 25, ¶ 9 (noting that we "apply a deferential standard of review to a court's exercise of its discretion under Rule 60(b)(6)"). As a result, we conclude that this argument—to the extent mother intended to raise it—is inadequately briefed and do not address it. See In re Snyder Grp., Inc., 2020 VT 15, ¶ 26 n.10, 212 Vt. 168, 233 A.3d 1077 (declining to reach inadequately briefed argument).